UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
    #:
DATE FILED: 12/2/14
```

-------------------------------------------------
                                                   X

RUSSELL PUBLISHING GROUP, LTD.,

            **Plaintiff,**

    - against -

BROWN PRINTING COMPANY,

            **Defendant.**

-------------------------------------------------
                                                   X

**OPINION AND ORDER**

**13 Civ. 5193 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.    INTRODUCTION**

       In an Opinion and Order dated April 3, 2014 ("April 3 Order"), I

dismissed the following six claims brought by Russell Publishing Group, Ltd.

("RPG") and its owner, Jane Russell, against Brown Printing Company ("Brown"):

(1) breach of the covenant of good faith; (2) common law fraud; (3) breach of

fiduciary duty — pecuniary loss; (4) breach of fiduciary duty — emotional

distress; (5) conversion; and (6) an accounting.[1]  Following the dismissal of these

---

[1]    *See generally Russell Publ'g Grp. v. Brown Printing Co.*, No. 13 Civ.
5193, 2014 WL 1329144 (S.D.N.Y. Apr. 3, 2014) ("*Russell I*").  Because Jane
Russell lacked standing, I dismissed all claims brought by her in her individual
capacity. *See id.* at *4.

claims, only one claim remained:  breach of contract.[2]  On April 10, 2014, RPG moved for reconsideration of the April 3 Order.[3]  I denied that motion in a Memorandum Opinion and Order dated April 21, 2014 ("April 21 Order").[4]

On August 13, 2014, I granted RPG leave to amend its complaint for the purpose of repleading its fraud claim.[5]  Brown now moves pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss RPG's amended fraud claim,[6] as well as pursuant to Rule 12(f) to strike RPG's "demand for punitive damages and damages for lost advertising revenue, lost advertising accounts, and loss of profits or business."[7]  For the reasons that follow, Brown's motion to dismiss is GRANTED, and Brown's motion to strike is GRANTED.

## II.    BACKGROUND

### A.    RPG's Initial Complaint and First Amended Complaint

---

[2]    *See id.* at *1 ("Brown moves to dismiss every cause of action except RPG's breach of contract claim[.]").

[3]    *See generally* Plaintiff's Notice of Motion for Reconsideration [Dkt. No. 32].

[4]    *See generally Russell Publ'g Grp. v. Brown Printing Co.*, No. 13 Civ. 5193, 2014 WL 1612166 (S.D.N.Y. Apr. 21, 2014) ("*Russell II*").

[5]    *See generally* Revised Order [Dkt. No. 78].

[6]    *See generally* 9/12/14 Notice of Motion to Dismiss [Dkt. No. 86].

[7]    *Id.* at 1.

The dispute in this case arises out of the alleged overbilling by Brown for printing services it rendered to RPG pursuant to a five-year contract between the two parties (the "Printing Agreement").[8]  RPG filed its Complaint against Brown in July 2013.[9]  However, faced with a motion to dismiss,[10] RPG amended its complaint as of right (the "First Amended Complaint" or "FAC").[11]

The First Amended Complaint alleged seven causes of action:  (1) breach of contract; (2) breach of the covenant of good faith; (3) common law fraud; (4) breach of fiduciary duty — pecuniary loss; (5) breach of fiduciary duty — emotional distress; (6) conversion; and (7) an accounting.[12]  RPG alleged that Brown had fraudulently, and in violation of the Printing Agreement, overbilled RPG for printing services from 2007 to 2012.[13]  RPG also alleged that Brown had acted as an advisor to RPG by offering advice, recommending vendors, and acting

---

[8]     *See* Complaint ("Compl.") ¶¶ 1, 14.  The Printing Agreement is governed by New York law and the Uniform Commercial Code.  *See* Printing Agreement, Ex. A to Declaration of Sammi Malek in Support of Defendant Brown Printing Company's Motion to Dismiss and to Strike, ¶¶ 5.3, 11.2.

[9]     *See generally* Compl.

[10]     *See generally* 9/25/13 Notice of Motion to Dismiss [Dkt. No. 9].

[11]     *See generally* FAC; *see also* 10/3/13 Order [Dkt. No. 12].

[12]     *See* FAC ¶¶ 53-80.

[13]     *See id.* ¶ 1.

as an intermediary in negotiations between RPG and a third party.[14]  RPG alleged further that Brown's online advertisements,[15] as well as statements made by Brown to RPG,[16] reinforced RPG's view of Brown as an advisor.[17]  Brown later breached this advisory role, RPG alleged, when Brown took "advantage of [Jane Russell,] a recently widowed woman suffering from a serious illness[,] to engage in a systematic pattern of overbilling."[18]

### B.    RPG's First Amended Complaint Is Dismissed

On October 30, 2013, Brown renewed its motion to dismiss,[19] which I granted in the April 3 Order.[20]  In granting Brown's motion to dismiss, I held, among other things, that (1) the facts, as alleged in the First Amended Complaint, "cannot give rise to a strong inference of Brown's intent to defraud [RPG;]" (2) "RPG was in a position to review Brown's invoices and discover the overbilling at

---

14    *See id.* ¶¶ 16-18.

15    *See, e.g.*, *id.* ¶ 11(a) ("[Brown] pride[s] [itself] on a consultative sales approach and our goal is to make the paper buying process easy and seamless.").

16    *See id.* ¶ 13 ("We [Brown] could and should have saved you [RPG] money, but didn't configure the paper orders most efficiently.").

17    *See id.* ¶¶ 11-12.

18    *Id.* ¶ 1.

19    *See generally* 10/30/13 Notice of Motion to Dismiss [Dkt. No. 17].

20    *See generally Russell I*, 2014 WL 1329144.

4

any time[;]" (3) "RPG had no legal duty separate from the duty to perform under the contract[;]" and (4) "[t]he facts contained in the [First Amended] Complaint do not allege that Brown intended to undertake any fiduciary duty or that its relationship with RPG amounted to more than an arm's length business transaction."[21]  I also found that Section 5.3 of the Printing Agreement permitted Brown to retain three issues of RPG's magazines until RPG paid all outstanding invoices.[22]

## C.   RPG's Motion for Reconsideration Is Denied

RPG moved for reconsideration of the April 3 Order, arguing that the Court had overlooked certain facts and case law in dismissing its claims.[23]  I denied RPG's motion for reconsideration, finding, with respect to RPG's fraud claim, that "Brown is a sophisticated professional printing company and RPG is a

---

[21]    *Id.* at *4-*5.

[22]    *See id.* at *5.  Section 5.3 of the Printing Agreement states, in relevant part, that "as collateral security for the payment of any amounts which may be or become due to [Brown] hereunder, [RPG] grants [Brown] a security interest in any [RPG] Materials (including Work in process and undelivered Work) which shall at any time be in [Brown's] possession[.]"  The Printing Agreement also contains an escrow provision, which states, in relevant part, that "if [RPG] shall dispute any item on any invoice . . . [and] such dispute is not resolved with[in] 30 days of the notice of the dispute, [RPG] agrees to pay the disputed amount in escrow to [Brown] or a mutually acceptable third party."  Printing Agreement ¶ 5.5.

[23]    *See generally* Plaintiff's Memorandum of Law in Support of RPG's Motion for Reconsideration.

sophisticated professional publisher, who has contracted with printers in the past. Brown had no reason to believe it owed RPG a duty of candor."[24]  With respect to RPG's breach of fiduciary duty claim, I found that (1) "[m]erely describing the parties' relationship as close or trusting is not sufficient to make it anything other than an ordinary, arms' length business relationship[;]" and (2) "advertising from Brown's website and an email from Brown's president offering to credit plaintiffs' account . . . do not show any unique degree of confidence or trust between the parties."[25]

### D.    RPG's Second Amended Complaint

Nearly four months later, on August 13, 2014, I granted RPG leave to amend its complaint (the "Second Amended Complaint" or "SAC") and replead its fraud claim.[26]  In repleading its fraud claim, RPG alleges the following facts (most of which RPG previously pleaded in the First Amended Complaint).[27]

### 1.    Brown Overbills RPG for Paper

---

[24]    *Russell II*, 2014 WL 1612166, at *2.

[25]    *Id.*

[26]    *See generally* Revised Order.

[27]    Where an alleged fact in the SAC has already been pleaded in the FAC, citations to both complaints will be provided.  For those allegations that are newly pleaded in the SAC, only a citation to the SAC will be provided.

RPG alleges that the Printing Agreement restricts the price Brown can charge RPG for paper.[28]  RPG argues that this restriction amounts to, at most, a three percent markup on Brown's direct costs for paper.[29]  However, RPG alleges that Brown "systematically" and fraudulently billed RPG for paper by more than three percent.[30]  RPG contends that Brown exceeded the three percent markup in fifty-eight out of seventy-two invoices, and that, on some occasions, the markup went as high as thirty-five percent.[31]

RPG alleges further that it "didn't have the information about what Brown was paying for paper" and that "[w]hen [RPG] asked to see [Brown's] paper bills, [Brown] refused."[32]  Moreover, RPG notes that it could not ascertain

---

[28]    *See* SAC ¶ 15(e); FAC ¶ 14(d).

[29]    *See id.*  The Printing Agreement states, "If [Brown] does not regularly supply paper for the Work, upon [RPG's] written request, [Brown] shall advise [RPG] in writing of the price (generally, [Brown's] current allocated paper cost plus a 3% mark-up) at which [Brown] would sell paper to [RPG.]"  Printing Agreement ¶ 6.3.

[30]    SAC ¶ 32(b).

[31]    *See id.* ¶ 32(b)(iii), (c)(i).

[32]    *Id.* ¶¶ 23(b), 39(b)(iii).

Brown's direct costs for paper by viewing Brown's vendors' bills because Brown

kept those bills "confidential."[33]

### 2.   Brown Reconfigures RPG's Magazines

While "bereaved by the death of her husband,"[34] Jane Russell tasked

Gary McGowen, an RPG employee, with reviewing the invoices from Brown.[35]

McGowen had no familiarity with the Printing Agreement, and RPG alleges that

McGowen acted primarily as a conduit of information between RPG and Brown.[36]

Nevertheless, RPG alleges that Brown seized upon McGowen's ignorance by

"sen[ding] [RPG] a new quote which changed the configuration of [RPG's

magazines] in a way that increased the [charge to RPG] by about $800 per

magazine."[37]

At some later time, however, Jane Russell "asked [Brown] who had

been responsible for the [reconfiguration]."[38]  Brown admitted to the

---

[33]     *See* Plaintiff's Opposing Brief ("RPG Opp.") at 13-14.

[34]     *Id.* at 15.

[35]     *See* SAC ¶ 33; FAC ¶ 34.

[36]     *See id.*

[37]     *Id.*

[38]     SAC ¶ 33(a); FAC ¶ 34.

reconfiguration, but stated that the reconfiguration had been "an oversight . . . and [took] full responsibility."[39]

### 3.    Brown's Increased Use of Pallets

Brown bills RPG for each pallet used to transport RPG's magazines.[40] Prior to March 2010, Brown had shipped RPG's magazines to RPG's warehouse.[41] This allowed RPG to determine the number of pallets used in transporting its magazines.[42]  But in March 2010, Brown began shipping RPG's magazines to a professional distributor.[43]  At that point, RPG could no longer determine how many pallets Brown used.[44]  RPG alleges that thereafter Brown "misrepresented the number of pallets used to transport [] RPG's magazines" and that "the number of pallets supposedly used went up sharply, sometimes doubling or more."[45]

### 4.    Brown's Overbilling for Transportation

---

[39]    SAC ¶ 33(b); FAC ¶¶ 18(e), 29.

[40]    *See* SAC ¶ 34(b); FAC ¶ 38(a).  Pallets are "wooden platform[s] onto which piles of magazines are placed, covered by shrink wrap, and strapped to the platform."  SAC ¶ 34(a); FAC ¶ 38(b).

[41]    *See* SAC ¶ 34(c); FAC ¶ 38(c).

[42]    *See id.*

[43]    *See* SAC ¶ 34(d); FAC ¶ 38(d).

[44]    *See id.*

[45]    SAC ¶¶ 34, 34(e); FAC ¶¶ 38, 38(e).

RPG alleges that Brown billed RPG for certain transportation services that Brown was not entitled to bill under the Printing Agreement.[46]  Moreover, RPG alleges that some of these transportation services "were not provided" and "could not have [been] provided[.]"[47]

### 5.    Brown's Billing for Ink and Bundling

In May 2012, Brown and RPG discussed a three-year extension to the Printing Agreement.[48]  RPG alleges that Brown offered to reduce RPG's printing costs by $40,000.[49]  But, RPG alleges, Brown simultaneously sought to recoup RPG's savings by misrepresenting two other costs:  ink and bundling.[50]  Regarding ink, RPG alleges only the following:  "[Brown] misrepresented that its cost of ink was $0.517/thousand copies, when in fact [Brown's] real cost was only $0.47/thousand copies."[51]  Regarding bundling, RPG alleged that Brown proposed a more costly method of bundling RPG's magazines.[52]  RPG rejected this proposal,

---

[46]    *See* SAC ¶ 35; FAC ¶ 39.

[47]    SAC ¶¶ 35, 35(b); FAC ¶¶ 39, 39(b).

[48]    *See* SAC ¶ 36; FAC ¶ 40.

[49]    *See id.*

[50]    *See* SAC ¶ 36(a); FAC ¶ 40(a).

[51]    SAC ¶ 36(b); FAC ¶ 40(b).

[52]    *See* SAC ¶ 36(c); FAC ¶ 40(c).

and Brown subsequently implemented the lower cost method.[53]  RPG alleges,

however, that Brown nevertheless billed RPG for the costlier method.[54]

### 6.    RPG's "Ganging the Covers"

In November 2011, RPG decided to "gang the covers" of its

magazines, meaning that "more than one magazine would [be] printed at a time."[55]

"Ganging the covers" reduced costs for RPG.[56]  However, RPG alleges that Brown

negated the effect of those savings by falsely purporting to label each magazine

only upon distribution (the costlier method), when in reality Brown labeled all

magazines at once, including those that Brown did not distribute until months later

(the lower cost method).[57]  Under these false pretenses, RPG alleges, Brown billed

for the costlier method.[58]

### E.    Damages

---

[53]    *See id.*

[54]    *See id.*

[55]    SAC ¶ 38; FAC ¶ 42.

[56]    *See id.*

[57]    *See* SAC ¶¶ 38(c), (d); FAC ¶¶ 42(c), (d).

[58]    *See* SAC ¶¶ 38(d); FAC ¶ 42(d).

11

RPG seeks fifty million dollars in punitive damages on its fraud claim.[59]  RPG also seeks compensatory damages — for loss of profits, business, advertising revenue, and advertising accounts — on both its fraud claim and its breach of contract claim.[60]  These compensatory damages, RPG argues, are the consequence of two events:  (1) Brown's overbilling of RPG; and (2) Brown's restraint of RPG's magazines.[61]

### 1.    Damages Resulting from Brown's Overbilling of RPG

RPG alleges that Brown's overbilling resulted in RPG's loss of both advertising revenue and advertising accounts.[62]  But, RPG alleges, Brown's overbilling caused far more extensive damage.  RPG contends that Brown's overbilling drained a substantial portion of RPG's working capital, thereby "destroy[ing]" RPG's net worth of nine million dollars.[63]  RPG therefore seeks nine million dollars in consequential damages.[64]

---

[59]     *See* SAC at 42.

[60]     *See id.*

[61]     *See id.* ¶ 44.

[62]     *See id.* ¶ 44(c).

[63]     *Id.* ¶ 44(d).

[64]     *See id.* ¶ 45.

### 2.     Damages Resulting from Brown's Restraint of RPG's Magazines

RPG argues that it suffered two million dollars in consequential damages — through the loss of advertising revenue and advertising accounts — as a result of Brown's refusal to release three issues of RPG's magazines.[65]  RPG alleges that Brown demanded payment from RPG for unpaid invoices totaling $115,000.[66]  RPG, however, refused to pay, arguing that Brown owed RPG a credit of (at least) $115,000 due to Brown's overbilling.[67]  Because RPG did not pay Brown's invoices, Brown refused to release three upcoming issues of RPG's magazines.[68]

However, Brown, as I have previously held, had the right under the Printing Agreement to withhold RPG's magazines in the event RPG failed to pay Brown's invoices.[69]  Nevertheless, RPG claims that Brown, during a settlement

---

[65]     *See id.* ¶ 44(b).

[66]     *See id.* ¶ 40.

[67]     *See id.*

[68]     *See id.* ¶ 41.  In refusing to release RPG's magazines, Brown relied upon sections 5.3 and 5.5 of the Printing Agreement.  *See supra* note 22.

[69]     *See Russell I*, 2014 WL 1329144, at *5; *Russell II*, 2014 WL 1612166, at *2.

13

negotiation in this case, offered $115,000 to RPG to resolve all claims.[70]  RPG,
relying on an interrogatory response from Brown, contends that this settlement
offer amounts to an "actual credit balance" in RPG's account with Brown.[71]

### 3.    The Printing Agreement's Limitation of Liability Clause

Section 11.4 of the Printing Agreement provides that "Except as
otherwise specifically provided in this Agreement, neither party hereto shall be
liable to the other for incidental, consequential, special or punitive damages; in
particular, [Brown] shall not be liable for any of [RPG's] lost advertising revenues,
or any lost advertising accounts or other loss of profits or business."  This clause
appears in a font size identical to that of the other clauses in the contract.[72]

## III.    LEGAL STANDARD

### A.    Motion to Dismiss

---

[70]    *See* RPG Opp. at 24-25.

[71]    *See id.*  Brown's interrogatory response stated, in relevant part, that
"to the extent a customer had/has a similar escrow provision in its contract with
[Brown] [that is, a provision similar to section 5.5 of the Printing Agreement], the
customer would not be required to place monies in escrow if the customer had an
actual credit balance (and not merely a claim for a credit balance)."  Defendant's
Responses and Objections to Plaintiff's Third Set of Interrogatories ("Brown
Interrogatory"), Ex. 6 to RPG Opp., at 4.

[72]    *See* Printing Agreement ¶ 11.4.

14

The question addressed on a Rule 12(b)(6) motion is whether the moving party's allegations "'plausibly give rise to an entitlement for relief.'"[73]  In assessing this question, the court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor."[74]

### B.    Heightened Pleading Standard Under Rule 9(b)

All claims sounding in fraud must comply with Rule 9(b)'s heightened pleading standard.[75]  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud."  This requires the plaintiff to: "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain

---

[73]     *Taveras v. UBS*, 513 Fed. App'x 19, 22 (2d Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[74]     *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 137 (2d Cir. 2013) (citing *Gorman v. Consolidated Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007)).

[75]     *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184–85 (2d Cir. 2008).

why the statements were fraudulent.'"[76]  "Allegations that are conclusory or unsupported by factual assertions are insufficient."[77]

### C.    Motion to Strike

Rule 12(f) governing motions to strike states, in relevant part, that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

## IV.    APPLICABLE LAW

### A.    Fraud

To state a claim for fraud under New York law, a plaintiff must show: "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."[78]  "'Where sophisticated businessmen engaged in major

---

[76]    *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[77]    *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986)).

[78]    *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996) (citing *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995)*; Channel Master Corp. v. Aluminum Ltd. Sales*, 4 N.Y.2d 403 (1953)).  *Accord Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001) (same).

transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'"[79]  Moreover, "'[a] heightened degree of diligence is required where the victim of fraud had hints of its falsity.'"[80]

### B.    Enforceability of Contractual Limitations on Consequential Damages

Uniform Commercial Code ("UCC") section 2-719 states that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable."[81]  UCC section 2-302, which governs unconscionable contracts and clauses, articulates that "[i]f the court as a matter of law finds . . . any clause of the contract to have been unconscionable at the time it was made[,] the court . . . may enforce the remainder of the contract without the unconscionable clause[.]"  Under New York law, "an unconscionable contract has been defined as one which is so grossly unreasonable as to be [unenforceable] because of an absence of meaningful choice on the part of one of the parties

---

[79]     *Universe Antiques, Inc. v. Vareika*, 510 Fed. App'x 74, 75 (2d Cir. 2013) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984)).

[80]     *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) (quoting *Banque Franco-Hellenique de Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 26-27 (2d Cir. 1997)).

[81]     U.C.C. § 2-719(3) (1977).

together with contract terms which are unreasonably favorable to the other

party[.]"[82]  Factors that courts consider in determining unconscionability include:

"the size and commercial setting of the transaction, whether deceptive or

high-pressured tactics were employed, the use of fine print in the contract, the

experience and education of the party claiming unconscionability, and whether

there was disparity in bargaining power[.]"[83]  The UCC adds that the "[l]imitation

of consequential damages for injury to the person in the case of consumer goods is

prima facie unconscionable but limitation of damages where the loss is commercial

is not."[84]

## V.   DISCUSSION

### A.   Brown's Motion to Dismiss Is Granted

RPG, in amending its complaint for a second time, seeks to replead its

fraud claim to cure the deficiencies that the Court previously identified in prior

opinions.  However, RPG's amended fraud claim remains deficient.  RPG has

failed to adequately plead justifiable reliance — a necessary element of fraud under

New York law.  Moreover, many of RPG's allegations in the Second Amended

---

[82]  *King v. Fox*, 7 N.Y.3d 181 (2006) (citing *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 10 (1988)).

[83]  *Gillman*, 73 N.Y.2d at 11.

[84]  U.C.C. § 2-719(3).

Complaint were already pleaded in the First Amended Complaint. Therefore, the Court has already considered these allegations in dismissing the fraud claim — first in the April 3 Order, and, once again, in the April 21 Order. Because RPG's present arguments in favor of finding justifiable reliance remain substantially similar to those argued in opposition to Brown's previous motion to dismiss (and in support of RPG's motion for reconsideration), I find that RPG's repleaded fraud claim, as alleged in the Second Amended Complaint, must be dismissed. To the extent I have not previously addressed RPG's arguments in support of finding justifiable reliance, I will address them now.

### 1. RPG Had the Ability to Review Brown's Bills and Discover the Overbilling at Any Time

In the April 3 Order, I stated that "RPG was in a position to review Brown's invoices and discover the overbilling at any time."[85] Now, however, RPG argues that it was in no such a position.

### a. Brown's Overbilling of RPG for Paper

RPG contends that Brown, as a bulk purchaser, bought paper at a lower price than the rest of the market, including RPG.[86] Therefore, RPG argues

---

[85]   *Russell I*, 2014 WL 1329144, at *4.

[86]   *See* RPG Opp. at 13.

19

that it could not have discovered the overbilling on its own because it was not privy to the bulk price for paper.[87]  Moreover, RPG argues that Brown marked its paper vendors' bills "confidential" to prevent RPG from learning Brown's true cost for paper.[88]  RPG also contends that "[w]hen [it] asked to see [Brown's] paper bills, [Brown] refused."[89]

Nevertheless, in this instance, RPG was required to exercise a "'heightened degree of diligence'" because "'hints of [] falsity'" existed.[90]  RPG alleges that Brown was contractually obligated to charge no more than a three percent markup on paper.[91]  However, RPG does not allege that it knew Brown's cost before entering into this agreement.  Nor does RPG allege that it made efforts to learn Brown's paper costs throughout the alleged fraud period.  Brown's unwillingness to disclose what it paid for paper creates a hint of falsity when the contract terms, according to RPG, only allow a three percent markup.  If Brown did not disclose what it paid for paper, RPG could not have seriously intended to

---

[87]     *See id.*

[88]     *See id.* at 13-14.

[89]     SAC ¶ 39(b)(iii); *see also* RPG Opp. at 14-15.

[90]     *Winnick*, 350 F. Supp. 2d at 406 (quoting *Christophides*, 106 F.3d at 26-27).

[91]     *See* SAC ¶ 15(e).

evaluate Brown's compliance with this contract provision.  Yet, RPG now uses this

provision as the basis of its fraud claim.  RPG cannot now claim that that it

justifiably relied on Brown.

### b.    Brown's Reconfiguration of RPG's Magazines

The notion that Brown's alleged deceit of McGowen somehow

prevented RPG from discovering the increase in cost is belied by the subsequent

allegation that "Jane Russell asked [Brown] who had been responsible for the

[reconfiguration]."[92]  Evidently, Jane Russell had the competence to detect

Brown's alleged wrongdoing.  That Jane Russell "was bereaved by the death of her

husband" does not release RPG of the obligation to protect its own interests.  For

that reason, shouldering McGowen with the responsibility of reviewing invoices

was an imprudent decision, and RPG cannot claim justifiable reliance.

### c.    Increased Use of Pallets

RPG cannot argue that it justifiably relied on Brown regarding the

increased use of pallets.  RPG had the opportunity to question Brown the moment

Brown no longer sent magazines to RPG's warehouse.  The sudden inability of

RPG to know the number of pallets used to transport its magazines should have

raised an immediate red flag.

---

[92]    *Id.* ¶ 33(a).

21

### d.      Brown's Billing for Transportation Services

RPG alleges that certain transportation-related charges expressly violated the Printing Agreement.[93]  However, if RPG now has the ability to ascertain the terms of the contract, it certainly had the ability at the time of overbilling.  Moreover, RPG does not allege that Brown hid these transportation charges within the invoices.  Also, the very crux of the allegation — that Brown charged for services it "could not have provided"[94] — indicates that RPG could have readily detected this overbilling.  Thus, RPG again failed to adequately monitor its own business and cannot claim justifiable reliance.

### e.      Brown's Overbilling for Ink

Regarding Brown's overbilling for ink, RPG has failed to meet the heightened pleading standard under Rule 9(b), and thus failed to adequately plead justifiable reliance.  RPG's allegations as to Brown's ink-related fraud amount to a single sentence.  RPG does not allege how Brown's statement was fraudulent, other than to allege that it was inaccurate.  For that reason, RPG has failed to allege fraud generally, as well as more specifically, justifiable reliance.

### f.      Brown's Billing for Bundling

---

[93]      *See id.* ¶ 35.

[94]      *See id.* ¶ 35(b).

22

With respect to the surcharge for bundling, RPG cannot claim justifiable reliance.  When Brown attempted to impose the surcharge, RPG refused.[95]  Moreover, there is no allegation that Brown attempted to hide the charge within the invoice.  RPG cannot therefore claim that it had no means of detecting Brown's overbilling.

### g.    "Ganging the Covers"

RPG understood the process involved in labeling the magazines.[96] RPG could therefore have disputed Brown's decision to cease labeling each magazine in advance.  Rather, RPG accepted the additional cost without question. RPG cannot claim justifiable reliance when the overbilling was readily apparent at the time.

### 2.    RPG Should Not Have Trusted Brown

RPG argues that it trusted Brown and that it therefore justifiably relied on Brown's misrepresentations.  But as I have stated in previous opinions, no fiduciary duty existed between Brown and RPG.[97]  Nor should RPG have trusted

---

[95]    *See id.* ¶ 36(c).

[96]    *See id.* ¶ 38.

[97]    *See Russell I*, 2014 WL 1329144, at *4-*5; *Russell II*, 2014 WL 1612166, at *2.

Brown.  If Brown's overbilling is as pervasive as RPG alleges,[98] then RPG should have realized, for the reasons discussed above, that it could not trust Brown.  The argument that RPG "was lulled into trusting [Brown] by assurances that it was watching out for [RPG's] best interests" is negated by RPG's failure to identify the overbilling early in the relationship.[99]  That Brown had given RPG advice and recommendations on prior occasions is inconsequential when the overbilling should have been readily apparent to a sophisticated entity such as RPG.

### 3.     Jane Russell's Bereavement and McGowen's Incompetence Do Not Justify RPG's Reliance on Brown

RPG contends that Jane Russell's bereavement and McGowen's incompetence permitted RPG to justifiably rely on Brown.[100]  But neither of these justifications are sufficient.  Russell had an obligation to her company to prevent it from financial harm.  When she chose McGowen — who lacked familiarity with the Printing Agreement — to assume the responsibility of reviewing invoices from Brown, Russell breached that obligation.  That she was distracted by her bereavement is no excuse.  Businesses have the responsibility of creating

---

[98]     RPG alleges Brown overbilled RPG in fifty-eight out of seventy-two invoices.  *See* SAC ¶ 32(c)(i).

[99]     RPG Opp. at 15.

[100]     *See id.* at 14-15.

contingency plans in the event their lead decision-makers cannot fulfill their duties.

RPG argues, however, that even if McGowen had been familiar with the Printing Agreement, he would not have been able to discover the overbilling. Such a task, RPG contends, would have required an in-depth knowledge of the printing process.[101]  But it makes no difference that knowledge of the Printing Agreement may have been of no benefit to discovering the overbilling.  By replacing Russell's competence with McGowen's incompetence, RPG allowed the overbilling to persist undiscovered.  For that reason, RPG cannot claim justifiable reliance on Brown.

## B.     Brown's Motion to Strike Is Granted

*First*, RPG's demand for punitive damages on its fraud claim is stricken because, as discussed above, RPG's fraud claim is dismissed.  *Second*, RPG's demand for consequential damages — namely, loss of profits, business, advertising revenue, and advertising accounts — is stricken.  In the first instance, the "limitation of liability" clause in the Printing Agreement expressly precludes RPG from collecting these types of consequential damages.  This clause is fully enforceable and not unconscionable.  Both parties are sophisticated entities operating in a commercial environment.  The clause is not buried in fine print

---

[101]     *See id.* at 15.

25

within the contract, nor is there any evidence of Brown having had an unfair bargaining position.  All indications show that the Printing Agreement, including this clause, was the result of fair bargaining and mutual assent.  Thus, the "limitation of liability" clause bars RPG's recovery of these consequential damages.

Moreover, with respect to the consequential damages flowing from Brown's restraint of RPG's magazines, RPG cannot collect these damages because Brown had a right to keep the magazines in its possession until RPG settled all outstanding invoices.  RPG argues that when Brown offered $115,000 as a settlement for all claims, that offer constituted an admission that RPG had a credit in the same amount against outstanding invoices (which at that point totaled $115,000).[102]  RPG relies on an interrogatory response from Brown to show that if a Brown "customer had/has a similar escrow provision in its contract with [Brown], the customer would not be required to place monies in escrow if the customer had an actual credit balance (and not merely a claim for a credit balance)."[103]  But a settlement offer does not constitute an "actual credit balance." Parties often make settlement offers with the hope of avoiding costly litigation.

---

[102]    *See id.* at 24-25.

[103]    Brown Interrogatory at 4.

The amount of a settlement offer only reflects the economics of settling versus litigating a claim.  Here, Brown's settlement offer does not reflect an admission of liability, nor an admission of how much Brown believes it owes RPG.  Therefore, RPG fails to show that the Printing Agreement did not allow Brown the contractual right to withhold RPG's magazines.

Lastly, RPG argues that the "limitation of liability" clause cannot exculpate Brown for conduct that is fraudulent, grossly negligent, or negligent.[104] RPG contends that, at a minimum, Brown acted negligently in overbilling RPG. However, this argument is misplaced.  Because I have dismissed RPG's fraud claim, consequential damages can only result from RPG's remaining breach of contract claim.  Under contract law, the party's intent when breaching the contract is immaterial.[105]  Therefore, the "limitation of liability" clause protects Brown despite allegations that suggest that Brown may have acted in a negligent manner.

## VI.   CONCLUSION

---

[104]   *See* RPG Opp. at 23-26.

[105]   *See Metropolitan Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430 (1994) ("Generally in the law of contract damages, as contrasted with damages in tort, whether the breaching party deliberately rather than inadvertently failed to perform contractual obligations should not affect the measure of damages.").

For the foregoing reasons, Brown's motion to dismiss is GRANTED, and Brown's motion to strike is GRANTED. The Clerk of the Court is directed to close this motion [Dkt. No. 85]. A conference is scheduled for January 9, 2015 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 2, 2014

28

**- Appearances -**

**For RPG:**

Richard Pu, Esq.
Richard Pu, P.C.
120 E. 90th Street, 10C
New York, New York  10128
(212) 427-3665

**For Brown:**

Sammi Malek, Esq.
Stephen L. Ball, Esq.
Baker & Hostetler LLP
45 Rockefeller Plaza
New York City, New York  10111
(212) 589-4200